Jon A. Titus (Bar No. 006501)
Joshua P. Weiss (Bar No. 035073)
**TITUS BRUECKNER SPITLER & SHELTS PLC**
8355 East Hartford Drive, Suite 200
Scottsdale, Arizona 85255
(480) 483-9600
JTitus@tbsslaw.com
JWeiss@tbsslaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Karla Kretsch, | Case No: 2:23-cv-00411-ROS |
| Plaintiff, | |
| vs. | **AMENDED COMPLAINT** |
| John Barton and Jane Doe Barton, husband and wife; John and Jane Does I-X; ABC Corporations I-X; XYZ Partnerships I-X; DEF LLCs, I-X, | (Tier 3) |
| Defendants. | |

For her Complaint against Defendants, Plaintiff Karla Kretsch ("Ms. Kretsch" or "Plaintiff"), alleges the following:

### PARTIES AND JURISDICTION

1.      Ms. Kretsch is and has at all relevant times been a resident of Maricopa County, Arizona.

2.      Defendant John Barton ("Barton" or "Defendant"), upon information and belief, is and was at all relevant times a resident of Colorado. Defendant Jane Doe Barton, upon information and belief, is the spouse of Barton. Barton's acts and conduct alleged herein were done for the benefit of himself and the marital community; Jane Doe Barton is named as a defendant solely for the purpose of binding the Barton marital community.

3.      Defendants Does I-X, ABC Corporations I-X, XYZ Partnerships I-X, and DEF LLCs I-X are employees, agents, or independent contractors acting within the scope of their employment and/or agency who have been fictitiously named and who may have caused, contributed to, received benefits from, aided or abetted, or conspired with the other

Defendants in the events alleged in this Complaint. Defendants Does I-X, were at all times acting on behalf of and in furtherance of their respective marital communities.

4.    On or about October 28, 2022, this action was commenced by Plaintiff Karla Kretsch State Court, Case No. CV2022-053429 ("State Action").

5.    Defendant Barton was personally served with the State Action Complaint and related documents on February 7, 2023.

6.    Defendant Barton filed a Notice of Removal with the District Court on March 8, 2023.

7.    This Court has diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1322, as Plaintiff Defendant are citizens of different states for purposes of determining diversity jurisdiction and the amount in controversy in this action exceeds $75,000.

8.    Venue is proper in the United States District Court, District of Arizona under 28 U.S.C. § 1441(a) as this Court is the United States District Court for the district corresponding to the place where the State Action was pending.

## FACTS

### Background

9.    Ms. Kretsch suffers from an autoimmune condition that requires costly medical treatments.

10.    Ms. Kretsch is a mother of two, so paying for her medical treatments and keeping food on the table was difficult by any standard.

11.    Upon information and belief, at all times relevant to this lawsuit, Defendant Barton knew of Ms. Kretsch's autoimmune condition and about her financial struggles.

12.    In or about 2008, Ms. Kretsch left her corporate job in order to pursue a different career path.

13.    Looking to work with and/or for the benefit of children in her new career, Ms. Kretsch purchased a franchise of a STEM-based franchise operating in the greater Phoenix area.

14.    During her evaluation of the franchise, Ms. Kretsch was introduced to Guy Newman, a fellow franchisee.

15.    Newman was, at the time, working as a registered representative of GVC Capital, LLC, an investment banking firm in Colorado, and brought Ms. Kretsch on as GVC's client.

16.    Defendant Barton had a long relationship with GVC and its principals, namely Steve Bathgate.

17.    Throughout the time period relevant to this lawsuit, Defendant Barton worked as a promotor of speculative ventures.

18.    Defendant Barton also authored a book titled "Oil Legends of the Rockies," the author's note of which states that he is a "consultant for the oil and gas industry, with an emphasis on emerging public companies" whose "influence in the energy industry continues today."

19.    Defendant Barton portrays himself as an "authority" in the oil and gas industry, but has proven nothing more than having a skill for using others' money for his own financial gain.

20.    Upon information and belief, at all times relevant to this lawsuit, Defendant Barton paid Newman a salary and other compensation for obtaining investors for Defendant Barton's many ventures.

21.    Upon information and belief, at all times relevant to this lawsuit, Newman was working as an agent, apparent agent, employee, partner, or joint venturer of Defendant Barton, acting withing the scope of his agency, employment, partnership, or joint venture.

22.    During the relevant time period, Defendant Barton paid Newman $10,000 per month, plus free securities, in exchange for Newman acting as his agent in soliciting funds for Defendant Barton's various ventures.

a.    **Creative Learning Corporation**

23.    While working in his role as a registered representative of GVC, Newman shifted the friendly discussion between him and Ms. Kretsch from the STEM-based

franchises to soliciting her for buying securities in Creative Learning Corporation ("CLC"), the purported parent company of the franchises, before CLC became a public company.

24.     While Ms. Kretsch had some savings, she needed access to her money for her medical bills and the expenses associated with raising a family and starting a franchise business.

25.     Ms. Kretsch's investment objectives, under any measure, should have been conservative investments, income, and safety of principal.

26.     During the solicitation, Defendant Barton was portrayed as a "major investor" in the company, which would later be shown to be false.

27.     In or about June 2010, Ms. Kretsch paid $100,000 from her 401K, resulting in $20,000 in taxes and penalties, to purchase two convertible notes in CLC.

28.     Thereafter, Ms. Kretsch converted the two notes into 250,000 shares in CLC, and was told that the "insider deal" she was getting would amount to a 20% ownership stake in CLC.

29.     Ms. Kretsch was not told, and was unaware that, her $100,000 investment was critical for CLC to establish the capital structure necessary for the CLC public offering to occur.

30.     Despite being touted as a "major investor," Defendant Barton put no capital into CLC.

31.     Despite the fact that Ms. Kretsch was the only one to put actual capital into CLC, she received very few shares relative to her contribution.

32.     Defendant Barton and his associates—including Newman and Defendant Barton's family member—received 2,450,000 shares of CLC despite none of those individuals providing any capital investment in the venture.

33.     Ms. Kretsch's shares in CLC never constituted a 20% ownership stake, as she was previously told, and her $100,000 from her 401k got her 250,000 shares, whereas the Barton group's free 2,450,000 shares were well over a 20% stake in the company.

34.     Ms. Kretsch was not told that her investment was going to result in a windfall

of riches for Newman, Barton and his associates.

### b.    Vanguard Energy Corporation

35.    Another of Defendant Barton's ventures was Vanguard Energy Corporation ("Vanguard").

36.    Defendant Barton was a director of Vanguard.

37.    Upon information and belief, Defendant Barton directly or indirectly encouraged and/or instructed Newman to solicit investors for Vanguard.

38.    To convince Ms. Kretsch to invest in Vanguard, a company in an industry in which she had no interest, Newman gave Ms. Kretsch 10,000 Vanguard shares in conjunction with an unrelated transaction.

39.    By giving Ms. Kretsch that initial 10,000 shares of Vanguard, Newman deceptively caused Ms. Kretsch to become "in" on Vanguard, despite her having no interest in energy companies.

40.    After successfully distracting Ms. Kretsch from her child-focused business, on or about February 13, 2011, Newman convinced Ms. Kretsch to invest $75,000 in Vanguard pursuant to a private placement.

### c.    Spectrum Resources Corporation

41.    Defendant Barton's next venture was Spectrum Resources Corporation ("Spectrum"), for which he served as President and Director.

42.    Upon information and belief, Defendant Barton again enlisted his money finder, Newman, to find investors in Spectrum.

43.    Upon information and belief, Defendant Barton knew that Newman was, as of March 23, 2011, no longer licensed to sell securities.

44.    In soliciting investments for Spectrum at Barton's behest, Newman concealed the fact that he was no longer licensed to sell securities.

45.    In April 2011, Newman solicited Ms. Kretsch to invest in Spectrum by writing to Ms. Kretsch the following: "Attached and below please find the info on Spectrum – John [Barton's] new deal for FRIENDS and FAMILY ONLY!" (emphasis in

original).

46.    In the same correspondence, Newman forwarded a summary of Spectrum written by Defendant Barton, in which he touts a "very limited number of Spectrum 'Founders' shares."

47.    The summary also includes a personal appeal—from Defendant Barton—encouraging Ms. Kretsch to "call [him] with any questions, and [to] let [him] know of [her] level of interest in the Spectrum founders' shares."

48.    Upon information and belief, Defendant Barton encouraged and/or directed Newman to return to who he viewed as a likely money source, Ms. Kretsch, for funding of Spectrum.

49.    In May 2011, Newman encouraged Ms. Kretsch to withdraw her investment funds from her 401k, causing her again to incur taxes and penalties, claiming that "we can always pay the penalty…"

50.    On June 30, 2011, Ms. Kretsch invested $30,000 in Defendant Barton's venture, paying taxes and penalties to withdraw funds from her 401k.

51.    In November 2011, Defendant Barton wrote in a letter to Spectrum investors, including Ms. Kretsch, that it "is expected that you will be receiving your first production checks from Spectrum in January 2012," and that investors "should be receiving these checks monthly for many years."

52.    Once the solicitation was complete, Newman acted as the go-between, forwarding emails from Defendant Barton to the investors, sometimes referring to Defendant Barton as "our Leader" when addressing investors.

53.    One such email shows that Defendant Barton was pitching the returns on investment as "mail box money," a phrase later used by Newman as a buzzword to maintain Ms. Kretsch's trust. This buzzword was based upon the image of making an investment with distributions regularly appearing in her mailbox.

54.    Of course, despite the promises of "mail box money," Spectrum thereafter went out of business and Ms. Kretsch's investment was rendered worthless.

### d.    Rockdale Resources Corporation

55.    Until March 13, 2013, Defendant Barton was a director and officer of Rockdale Resources Corporation ("Rockdale").

56.    Upon information and belief, Defendant Barton again directed his finder, Newman, to solicit investments for his new venture.

57.    In January 2012, Newman solicited Ms. Kretsch to invest $40,000 by forwarding an email from Defendant Barton wherein he touts "drilling of 6 to 8 wells a month…for values far in excess of the original price."

58.    The email also presses Newman to find investors to fund the accomplishment of certain tasks, including raising $40,000 investments for 100,000 shares to be "used to buy [the] shell company (Art Design) and prepare for merger with Rockdale."

59.    Newman, of course, thought of Ms. Kretsch to fund the shell company, as she had already fallen victim to the scheme once prior with CLC.

60.    The shell company would prove to be one of the critical centerpieces to Defendant Barton's future pitches to potential Rockdale investors: he wrote "We have the credibility, the property, the management team, **the public shell**, and **our ability to structure it and raise capital.**" (emphasis added).

61.    Note that when referring to "raising capital," Defendant Barton recognized that both Newman *and* Defendant Barton were necessary pieces.

62.    Again, Ms. Kretsch's investment was critical for Rockdale to establish its initial capital structure.

63.    Instead of thanking Ms. Kretsch, Newman instead made it seem like she was the one coming out on top, writing: "$40,000 gets you 100,000 shares - if it gets to $4 later this year – that's a 1,000% return – Karla getting the sweetheart deal again!!"

64.    Knowing that Ms. Kretsch was sick and looking for ways to support her family, Newman promised that she would be receiving "mailbox money."

65.    Defendant Barton sent a letter to Ms. Kretsch in Arizona, touting Rockdale and its "low-risk development oil wells in an established field in northwest Texas."

66.    In characterizing the investment as "low-risk," Defendant Barton concealed the fact that they were risky and illiquid investments unsuitable for someone looking to pay bills each month.

67.    Upon information and belief, Defendant Barton directed and/or encouraged Newman to continue seeking further investment from Ms. Kretsch, leading to her total investments of $61,000 in Rockdale and $50,000 more in Spectrum, all subject to taxes and penalties for withdrawing funds from her 401k.

68.    Yet, Newman later told Ms. Kretsch the following: "Remember, we have a plan for all of you--- that encompasses repositioning monies out of Vanguard and Rockdale down the line, into future Spectrum drilling programs that provide monthly 'mailbox money' for you and your families for many years to come. This is the next step—lets' stay focused and we will reach the goal."

69.    Again, that "mailbox money" never came, and Ms. Kretsch was left with nothing.

70.    SEC filings show that in late-2012 and early-2013, during Defendant's tenure at Rockdale, Spectrum began experiencing financial difficulties and investors were demanding relief.

71.    In response, Rockdale severed all ties with Defendant Barton and entities with which he was affiliated.

72.    To effectuate this separation, 2,031,707 shares of Rockdale stock, belonging to Defendant Barton and a number of persons controlled by or affiliated with Defendant Barton, were bought back by Rockdale for aggregate consideration of $800.00.

73.    Defendant Barton continued discussions with Ms. Kretsch about Rockdale, even after he had been expelled from Rockdale, thus impressing upon her that he was still involved.

### e.    **General Cannabis Corporation**

74.    Defendant Barton, a self-proclaimed "oil expert," then ventured into the world of cannabis, with his next venture, General Cannabis Corp. ("GCC").

75.    Upon information and belief, Defendant Barton yet again dispatched his fundraising lieutenant, Newman, to raise capital for GCC.

76.    In January 2014, Newman told Ms. Kretsch to "take a look" at Defendant's newest venture, stating that "maybe we will get out of this unscathed after all."

77.    What Newman did not disclose to Ms. Kretsch—and what would have been pivotal to any future investor in one of Defendant Barton's ventures—is that he had a history of failure and non-disclosure and oftentimes left investors with major losses while he and his network of family and associates benefited.

78.    While concealing these realities the entire time, Newman attempted to issue shares of GCC to Ms. Kretsch as yet another way to disguise her losses.

79.    The ongoing concealment and lies, and the financial ramifications of Defendant's actions, caused Ms. Kretsch mental anguish and caused her health to decline.

### f.    FINRA Arbitration Against Newman

80.    In June 2020, Ms. Kretsch brought a statement of claim in a Financial Industry Regulatory Authority ("FINRA") arbitration against Newman and GVC, alleging against Newman the following: 1) securities fraud; 2) negligence; 3) breach of fiduciary duty; 4) constructive fraud; and 5) negligent misrepresentation.

81.    Ms. Kretsch would have pursued Defendant Barton, along with Newman and GVC, in the same proceeding, but Defendant Barton is not subject to FINRA regulation like Newman and GVC.

82.    After presenting her case to a panel of three FINRA arbitrators who are all attorneys, Ms. Kretsch prevailed on her claims against Newman and was awarded damages.

83.    The panel ruled unanimously in Ms. Kretsch's favor.

84.    The arbitration award was then confirmed by the Honorable Dominic Lanza of this Court.

85.    During the arbitration, the parties litigated the underlying factual issues with full and fair opportunity to do so, and the resolution of those factual issues was essential to the decision against Newman and in Ms. Kretsch's favor.

86.    During the FINRA arbitration and the production of documents therein, Ms. Kretsch first learned of the magnitude of Defendant Barton's fraud.

87.    In successfully arbitrating her numerous claims against Newman in front of a panel of FINRA arbitrators, Ms. Kretsch incurred significant attorneys' fees.

88.    But-for Defendant Barton's actions, Ms. Kretsch never would have needed to arbitrate her case against Newman.

89.    Defendant Barton's direction, encouragement, and participation in the events described herein made it necessary for Ms. Kretsch to incur expenses to protect her interests.

90.    Ms. Kretsch's costs and attorneys' fees are the direct consequence of Defendant Barton's actions.

## ALLEGATIONS SPECIFIC TO THE EXERCISE OF JURISDICTION

91.    Arizona courts may exercise personal jurisdiction to the greatest extent allowed by the United States Constitution. Ariz. R. Civ. P. 4.2(a); *Planning Grp. of Scottsdale, LLC v. Lake Mathews Mineral Properties, Ltd.*, 226 Ariz. 262, 265, ¶ 12 (2011).

92.    District courts have the power to exercise personal jurisdiction to the extent authorized by the law of the state in which they sit. Fed. R. Civ. P. 4(k)(1)(A).

93.    For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

94.    The Ninth Circuit has established a three-prong test for analyzing a claim of specific personal jurisdiction: (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the

exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *Lake v. Lake,* 817 F.2d 1416, 1421 (9th Cir.1987).

95. Defendant Barton, on multiple occasions, sent letters and emails to Ms. Kretsch in Arizona regarding her current or prospective investments into his various companies.

96. Fully aware that Ms. Kretsch was an Arizona resident, Defendant Barton transacted with Ms. Kretsch to get her investments.

97. Each action taken by Newman as described herein was done on Defendant Barton's behalf and his agent, apparent agent, employee, partner, or joint venturer, or as a result of Defendant Barton's encouragement and/or direction.

98. Newman often forwarded emails from Defendant Barton to Ms. Kretsch in Arizona as part of the "out of state crowd" with updates on various ventures.

99. On multiple occasions, Defendant Barton had telephone conversations with Ms. Kretsch while she was in Arizona.

100. During his telephone conversations with Ms. Kretsch, Defendant Barton gave updates on the various ventures, and, eventually, promised to "make her whole."

101. During an April 14, 2017 telephone conversation with Ms. Kretsch, Defendant Barton requested that Ms. Kretsch provide him with her damages, which she thereafter sent to Defendant Barton directly.

102. After Ms. Kretsch's initial investments in CLC, whereby she proved that she had money, Defendant Barton repeatedly sought her Arizona retirement savings as a means of supporting his various ventures.

103. Defendant Barton invited and paid for Ms. Kretsch to fly from Arizona to Austin for a meeting of oil-field investors, which was an overnight trip.

104. Even assuming he has no physical presence in Arizona, Defendant Barton's actions constitute his purposeful direction into Arizona.

105. Each of the claims herein arise out of Defendant Barton's purposeful direction into Arizona.

106.    Because Defendant Barton has sufficient contacts with Arizona and the claims herein arise out of those contacts, this Court is reasonably justified in exercising jurisdiction over Defendant Barton.

## **TOLLING**

107.    Defendant Barton and Ms. Kretsch entered into a tolling agreement, fully executed and binding on both parties as of April 1, 2019.

108.    The tolling agreement concerns "certain claims against [Barton] arising out of the offer and sale of securities by or involving the Parties."

109.    The tolling agreement states that "the running of any statute of limitations, doctrine of repose, waiver, laches, or any other time-based limitations applicable to any such Claim is tolled."

110.    In addition, Newman's and Barton's concealment—Ms. Kretsch only first discovered the extent of the deception after the FINRA arbitration—tolled the statutes of limitation. *Walk v. Ring*, 202 Ariz. 310, 44 P. 3d 990 (2002) (concealment relieves the plaintiff's duty of diligent investigation required by the discovery rule and tolls the statute of limitations).

111.    Furthermore, where, as here, defendants breach a fiduciary duty, "an actual knowledge standard applies to triggering the statute of limitations." *Id.*, 202 Ariz. at 315-16 ¶21 (2002).

112.    Arizona follows the discovery rule; and a breach of contract claim does not accrue until "the plaintiff knew or should have known the facts giving rise to the claim[,]" including the fact that plaintiff "had been injured." *See Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 590-91 (1995) ("blamelessly uninformed plaintiff cannot be said to have slept on his rights.").

113.    Throughout the years, Ms. Kretsch was consistently told by Newman and Defendant Barton that they would make her whole.

114.    Ms. Kretsch was consistently told that she was "covered" and would be taken care of by Defendant Barton and Newman.

115.   As late as April 14, 2017, Defendant Barton advised Ms. Kretsch that he would help her recover her losses.

116.   The constant promises to make Ms. Kretsch whole were an attempt by Defendant Barton and Newman to delay Ms. Kretsch's discovery of their misdeeds.

117.   Defendant Barton's continued concealment of the realities of his expertise and past left Ms. Kretsch no choice but to maintain her confidence in him.

118.   As Newman was her financial advisor and fiduciary, an adverse result regarding her investment was not sufficient to trigger the statute of limitations.

119.   The entire time Ms. Kretsch was being influenced by Newman and Defendant Barton, it was under the guise that she was being shepherded along by two legitimate businesspeople.

120.   In reality, Defendant Barton and Newman were concealing their checkered history and lack of real expertise in anything but raising money.

121.   Defendant Barton and/or his agent Newman committed a fraud to conceal the accrual of the causes of action pled herein.

## OFFER TO SETTLE

122.   After the events described herein occurred, Ms. Kretsch, through counsel, demanded repayment from Defendant Barton and Newman.

123.   After negotiations, Defendant Barton and Newman agreed to pay Ms. Kretsch $500,000 in stock in order to make her whole (the "Agreement").

124.   Defendant Barton has not paid Ms. Kretsch the stock nor its monetary equivalent owed pursuant to the Agreement, thereby breaching its terms.

## FIRST CLAIM OF RELIEF

**(Arizona Securities Fraud – Misrepresentations and Omissions)**

125.   Plaintiff realleges every allegation of this Complaint.

126.   At the urging of Defendant and Newman, Plaintiff converted two notes into 250,000 shares in CLC.

127.   Defendant and Newman told Plaintiff she would be getting a 20% ownership

stake in CLC.

128.    Plaintiff was not told, and was unaware that, her $100,000 investment was critical for CLC to establish the capital structure necessary for the CLC public offering to occur.

129.    Despite being touted as a "major investor," Defendant Barton put no capital into CLC.

130.    Despite the fact that Plaintiff was the only one to put actual capital into CLC, she received very few shares relative to her contribution.

131.    Defendant Barton and his associates—including Newman and Defendant Barton's family member—received 2,450,000 shares of CLC despite none of those individuals providing any capital investment in the venture.

132.    Plaintiff's shares in CLC never constituted a 20% ownership stake, as she was previously told; her $100,000 from her 401k got her 250,000 shares, whereas the Barton group's free 2,450,000 shares were well over a 20% stake in the company.

133.    Later, Defendant and Newman failed to disclose to Plaintiff that Defendant had been removed from the Rockdale Board of Directors when soliciting Plaintiff's investment in Spectrum.

134.    Defendant actively portrayed himself as a member of the Rockdale Board of Directors after his removal, and continued to that misrepresentation to secure Plaintiff's investment in Spectrum.

135.    By committing the above acts or omissions, in addition to other acts and omissions alleged herein, Defendant Barton, directly or indirectly, employed devices, schemes and artifices to defraud and engaged in transactions, practices or courses of business that operated as a fraud upon Plaintiff, all in violation of A.R.S. §44-1991.

136.    Defendant also misrepresented material facts and omitted to state material facts that were necessary in light of the circumstances to make the statements made not misleading in violation of A.R.S. §44-1991(A)(2).

137.    Defendant made, participated in, induced, aided, abetted, approved, knew or reasonably should have known of the acts, omissions, transactions and conduct alleged herein.

138.    Pursuant to A.R.S. § 44-2001, each sale of securities made in violation of A.R.S. § 44-1991 is voidable at the election of the purchaser.

139.    Pursuant to A.R.S. § 44-2001 and § 44-2002, Plaintiff is entitled to recover all damages sustained as a result of Defendant's violations of A.R.S. § 44-1991, plus interest, attorneys' fees, costs and other relief the Court may deem appropriate.

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation)

140.    Plaintiff realleges every allegation of this Complaint.

141.    As alleged more particularly herein, Defendant, in the course of his business, supplied false information to Plaintiff regarding the true nature of the advice and services he offered to Plaintiff.

142.    Defendant failed to exercise reasonable care or competence in obtaining and communicating the relevant information regarding the risk of investing in risky, illiquid securities.

143.    As a result, Defendant breached his duty of care to Plaintiff.

144.    Misrepresentation of the facts and assurances described herein caused Plaintiff to acquiesce to Defendant's will, allowing Defendant and his associates to convince Plaintiff to continuously invest in companies with little, if any, chance of success.

145.    As a result of Defendant's negligent misrepresentations upon which Plaintiff justifiably relied, Plaintiff has suffered damages in an amount to be proved at trial, plus interest, together with costs, attorneys' fees and costs of collection, and other relief this Court may deem appropriate.

## THIRD CLAIM FOR RELIEF

### (Control Person Liability)

146.    Plaintiff realleges every allegation of this Complaint.

147.    Defendant is vicariously liable as a "controlling person" for Newman's violations of Arizona securities laws.

148.    Each of Newman's acts described in this Complaint were taken by Newman on behalf of and at the direction of Defendant Barton as his agent.

149.    A.R.S. § 44-1999(B) imposes "presumptive control liability on those persons who have the power to directly or indirectly control the activities of those persons or entities liable as primary violators of §§ 44-1991 and 1992." *Eastern Vanguard Forex, Ltd. v. Arizona Corp. Comm.*, 206 Ariz. 399, 412, 79 P.3d 86, 99 (App. 2003).

150.    Defendant encouraged, directed, and/or enabled Newman's pattern of fraud and deceit and thus is also liable for Newman's actions under doctrines of *respondeat superior* and actual or apparent agency.

151.    At the urging of Defendant and Newman, Plaintiff converted two notes into 250,000 shares in CLC.

152.    Defendant and Newman told Plaintiff she would be getting a 20% ownership stake in CLC.

153.    Plaintiff was not told, and was unaware that, her $100,000 investment was critical for CLC to establish the capital structure necessary for the CLC public offering to occur.

154.    Despite being touted as a "major investor," Defendant Barton put no capital into CLC.

155.    Despite the fact that Plaintiff was the only one to put actual capital into CLC, she received very few shares relative to her contribution.

156.    Defendant Barton and his associates—including Newman and Defendant Barton's family member—received 2,450,000 shares of CLC despite none of those individuals providing any capital investment in the venture.

157.    Plaintiff's shares in CLC never constituted a 20% ownership stake, as she was previously told; her $100,000 from her 401k got her 250,000 shares, whereas the Barton group's free 2,450,000 shares were well over a 20% stake in the company.

158.   Later, Defendant and Newman failed to disclose to Plaintiff that Defendant had been removed from the Rockdale Board of Directors when soliciting Plaintiff's investment in Spectrum, continuing to portray Defendant Barton as a member of the Rockdale Board of Directors after his removal, and continuing that misrepresentation to secure Plaintiff's investment in Spectrum.

159.   By committing the above acts or omissions, in addition to other acts and omissions alleged herein, Defendant Barton, directly or indirectly, employed devices, schemes and artifices to defraud and engaged in transactions, practices or courses of business that operated as a fraud upon Plaintiff, all in violation of A.R.S. §44-1991.

160.   As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to recover damages from Defendant in a specific amount to be proven at trial, plus interest, costs, attorneys' fees and other relief this Court may deem appropriate.

## FOURTH CLAIM FOR RELIEF

### (Constructive Fraud)

161.   Plaintiff realleges every allegation of this Complaint.

162.   During the relevant time period, a relationship of trust and confidence existed between Plaintiff and Defendant as a result of the entrusting of power to Defendant, the superiority of position of Defendant, and the fiduciary relationship between business owner/direct, advisor (Defendant Barton's agent, Newman), and client.

163.   As a result of the confidential and trust relationship, Plaintiff placed reliance on the trustworthiness of Defendant and the Defendant was under a duty to make full and truthful disclosure of all material facts.

164.   Defendant committed constructive fraud by breaching his duty to make full disclosure to Plaintiff.

165.   Defendant failed to fully disclose material facts to Plaintiff, including, but not limited to, the fact that the securities being purchased were risky and illiquid investments.

166.   Plaintiff is thus entitled to damages and to be the beneficiary of a constructive

trust imposed on Defendant in a specific amount to be proven at trial, plus interest, costs, attorneys' fees and other relief this Court may deem appropriate.

## FIFTH CLAIM FOR RELIEF

### (Civil Conspiracy)

167.    Plaintiff realleges every allegation of this Complaint.

168.    Newman had a fiduciary duty to Plaintiff as her financial and/or investment advisor.

169.    Newman breached the fiduciary duties he owed to Plaintiff by, among other things, failing to use proper care in recommending investments and failure to act with the utmost loyalty and integrity.

170.    Defendant and Newman conspired to mislead—through direct representations or material omissions—Plaintiff in order to obtain her investment in what were known to Defendant and Newman to be risky, illiquid securities that were unfit for Plaintiff's financial goals.

171.    In so doing, Defendant and Newman conspired to cause Newman to breach his fiduciary duty to Plaintiff.

172.    Defendant knew that Newman's conduct constituted a breach of various duties owed by Newman to Plaintiff.

173.    Defendant Barton and Newman further conspired to commit fraud by way of misrepresentation of material facts and omission of material facts that were necessary in light of the circumstances to make the statements made not misleading.

174.    Defendant Barton and Newman conspired to knowingly make false statements of material fact to Plaintiff wherein they represented that the companies in which Plaintiff was investing were low-risk investments, when, in fact, the investments were highly risky and illiquid.

175.    Defendant and Newman conspired to knowingly represent Defendant Barton as an expert in the oil and gas industry, when he was, in reality, only an expert in raising funds for various ventures in numerous industries.

176.    Defendant and Newman conspired to mislead Plaintiff into believing that she would receive 20% of the shares of CLC, despite knowing that she would receive significantly less than that amount.

177.    Defendant and/or Newman conspired to use their influence on Plaintiff to steer her out of her child-focused business into oil and gas investments they knew to be risky and illiquid.

178.    Plaintiff relied on Defendant's and Newman's representations regarding the investments and had the right to rely on Defendant's representations due to his positions within the various companies.

179.    Defendant and Newman conspired to pursue a course of conduct knowing that it created a substantial risk of harming Plaintiff.

180.    Defendant's and Newman's conspiracy to commit the aforementioned wrongful and unlawful acts caused damages to Plaintiff in an amount to be determined at trial.

181.    Defendant's and Newman's conspiracies were done intentionally and with malice for the sole purpose of causing harm to Plaintiff, and, therefore, Plaintiff should be awarded punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Fraud)

182.    Plaintiff realleges every allegation of this Complaint.

183.    Defendant knowingly made false statements of material fact to Plaintiff wherein he represented that the companies in which Plaintiff was investing were low-risk investments, when, in fact, the investments were highly risky and illiquid.

184.    Defendant knowingly represented himself as an expert in the oil and gas industry, when he was, in reality, only an expert in raising funds for various ventures in numerous industries.

185.    Defendant and/or Newman acting on Defendant's behalf, expressly told Plaintiff that she would receive 20% of the shares of CLC, despite knowing that she would

1   receive significantly less than that amount.

2       186.    Defendant and/or Newman used their influence on Plaintiff to steer her out

3   of child-focused business into oil and gas investments they knew to be risky and illiquid.

4       187.    Plaintiff relied on Defendant's representations regarding the investments and

5   had the right to rely on Defendant's representations due to his positions within the various

6   companies.

7       188.    Defendant intended to cause injury to Plaintiff and/or was motivated by spite

8   or ill will.

9       189.    Defendant consciously pursued a course of conduct knowing that it created

10  a substantial risk of harming Plaintiff.

11      190.    Defendant acted to serve his own best interest, having reason to know and

12  consciously disregarding a substantial risk that his wrongful conduct would significantly

13  harm Plaintiff.

14      191.    As a result, Plaintiff is entitled to recover punitive damages against

15  Defendant.

16      192.    Further, as a consequence of Defendant's fraudulent misrepresentations

17  and/or omissions, Plaintiff was damaged in an amount to be determined at trial.

18              **<u>SEVENTH CLAIM FOR RELIEF</u>**

19              **<u>(Aiding and Abetting Tortious Conduct)</u>**

20      193.    Plaintiff realleges every allegation of this Complaint.

21      194.    <u>Arizona law recognizes aiding and abetting tortious conduct as its own cause

22  of action.</u>

23      195.    As described herein and as decided by the FINRA panel of arbitrators,

24  Newman has engaged in tortious conduct in the form of negligence, breach of fiduciary

25  duty, and negligent misrepresentation.

26      196.    <u>Newman, as Plaintiff's financial advisor, owed Plaintiff a fiduciary duty.</u>

27      197.    Newman, as the primary tortfeasor, caused injury to Plaintiff by breaching

28  the duties he owed to Plaintiff.

198.    Defendant knew that Newman's conduct constituted a breach of various duties owed by Newman to Plaintiff.

199.    Defendant substantially assisted, encouraged, participated in, and/or directed Newman in committing the tortious conduct set forth in this Complaint.

200.    Defendant is liable for damages for aiding and abetting Newman's tortious conduct as alleged herein in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### (Negligent Infliction of Emotional Distress)

201.    Plaintiff realleges every allegation of this Complaint.

202.    Defendant's conduct as described herein constitutes negligence.

203.    Defendant's negligence created an unreasonable risk of injury to Plaintiff.

204.    Defendant's negligence was the cause of emotional distress to Plaintiff.

205.    Plaintiff's emotional distress resulted in physical injury or illness to Plaintiff and Plaintiff's damages.

206.    Plaintiff is thus entitled to damages from Defendants in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

207.    Plaintiff realleges every allegation of this Complaint.

208.    Defendant's conduct as described herein was extreme and outrageous such that recovery is permitted.

209.    Defendant either intended to cause Plaintiff emotional distress or recklessly disregarded the near certainty that distress would result from his conduct.

210.    Defendant's conduct cause Plaintiff severe emotional distress.

211.    Plaintiff is entitled to damages for her emotional distress in an amount to be determined by the trier-of-fact.

212.    Defendant's conduct was wanton, reckless and/or showed spite or ill will or reckless indifference to Plaintiff's interests, thus justifying an award of punitive damages

in an amount to be determined by the trier-of-fact.

## TENTH CLAIM FOR RELIEF

### (Breach of Contract)

213.    Plaintiff incorporates by reference each and every allegation of this Complaint as if again alleged in full.

214.    The Agreement is binding and legally enforceable, and Defendant is therefore bound by its terms.

215.    Pursuant to the Agreement, Defendant Barton was bound to pay Ms. Kretsch "$500,000 of stock in two companies."

216.    Defendant Barton breached the Agreement by failing to pay the amount due to Ms. Kretsch.

217.    Defendant Barton's actions and inactions, as referred to elsewhere herein, may constitute other breaches of the Agreement.

218.    Defendant Barton has failed to rectify the material breach or breaches despite demand and has failed to either repair or remedy the same.

219.    Plaintiff has not excused this material breach or material breaches.

220.    Plaintiff has fulfilled her obligations under the Agreement.

221.    Defendant Barton's actions and/or inactions have caused, and will continue to cause, Plaintiff damage in an amount to be proven at trial.

222.    In addition to equitable and compensatory relief, Plaintiff is entitled to an award of her costs under A.R.S. § 12-341 and attorneys' fees pursuant to A.R.S. § 12-341.01.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues for which Plaintiff is entitled to one under applicable law.

**WHEREFORE**, Plaintiff requests judgment in her favor, and against Defendant, as follows:

A.    For judgment and an award of all compensatory, incidental, and

consequential damages against Defendant provided by law, including treble damages under A.R.S. § 13-2314.04(D)(4), in an amount to be determined by the trier-of-fact but not less than $500,000;

B.   For an order of restitution and/or disgorgement as permitted under the law;

C.   For an award of punitive damages in an amount to be determined by the trier-of-fact;

D.   For an award of Plaintiff's reasonable attorneys' fees pursuant to A.R.S. § 13-2314.04(A) and A.R.S. §§ 44-2001 and § 44-2002;

E.   For Plaintiff's costs and attorneys' fees incurred in her FINRA arbitration, pursuant to the "tort of another" doctrine and any other applicable law or legal principle;

F.   For pre-judgment and post-judgment interest at the highest rate allowed by law; and

G.   For any other further relief that the Court deems reasonable and just under the circumstances.

Respectfully submitted this 5th day of May 2023.

**TITUS BRUECKNER SPITLER & SHELTS PLC**

/s/ Joshua P. Weiss
Jon A. Titus
Joshua P. Weiss
*Attorneys for Plaintiff*

On May 5, 2023, a courtesy copy of the foregoing was mailed to the following address pursuant to section II.D.3. of the Electronic Case Filing Administrative Policies and Procedures Manual:

Honorable Roslyn O. Silver
United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 624
401 West Washington Street, SPC 59
Phoenix, AZ 85003-2158

By C. Delisa-Hughes